UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANGEL MIGUEL AGUILA                           CIVIL ACTION

VERSUS                                        NO. 11-653 c/w 11-654

DEPUTY JOHNNY HECK ET AL.                     MAGISTRATE JUDGE
                                              JOSEPH C. WILKINSON, JR.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

These consolidated matters were referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon the written consent of all parties.  Record Doc. Nos. 39 in C.A. No. 11-653 and 9 in 11-654.  Plaintiff, Angel Miguel Aguila, seeks damages pursuant to 42 U.S.C. § 1983 for alleged excessive force and failure to protect him from harm arising from his April 12, 2010 arrest by defendants, deputies of the Jefferson Parish Sheriff.  A trial was held before the court on November 1, 2011.

Having considered the evidence at trial, the record, the testimony of the witnesses, the arguments and written submissions of the parties and the applicable law, the court makes the following findings of facts and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

1.      On April 12, 2010, Aguila and an accomplice used a Daisy .177 caliber 4.5 mm "BB" handgun, Joint Exhibits 2-Q and R, to rob the Shell gasoline station and convenience store at the corner of Terry Parkway and the Westbank Expressway near Terrytown on the Westbank of Jefferson Parish.  It was the last in a string of four similar robberies that Aguila perpetrated.  Joint Exhibit 3 (Suppl. Report of Det. Frank Renaudin).  Aguila pled guilty in state court on October 25, 2010 to four counts of first degree robbery, and he is currently serving a sentence of five years in prison.

2.      At the time of the April 12, 2010 robbery, all defendants were deputies and/or detectives employed by the Jefferson Parish Sheriff's Office.  Defendant Johnny Heck was a deputy assigned to the sheriff's K-9 Division, with responsibility for handling a trained, 90-pound police dog.  Defendant Kim Steirwald was a deputy assigned to photograph crime scenes.  Defendants David Canas, Frank Renaudin and John Carroll were detectives.  Defendant Newell Normand was the Jefferson Parish Sheriff.

3.      Sometime between 8:00 and 10:30 p.m. on April 12, 2010, Aguila and his accomplice committed their robbery near the Oakwood Shopping Center on the Westbank of Jefferson Parish, fled the scene and were apprehended.  The sheriff's office, including defendant Heck, was almost immediately notified of the robbery by

the store clerk victim, and deputies quickly arrived at the scene shortly after it had occurred. Heck and another K-9 officer each had their police dogs with them. After stealing cash and exiting the Shell station, Aguila and his accomplice had fled on foot across Terry Parkway and into a thickly overgrown and heavily wooded area near a canal and levee which separate Jefferson Parish from Orleans Parish. They separated, and Aguila had the cash, gun and other items used in the robbery in a red and gray carrying bag in his possession. Aguila hid the bag containing the cash and gun in a clump of bushes. Aguila saw a hole in the ground nearby in the heavy underbrush. He crawled into it and covered himself with some of the fallen tree limbs and underbrush, attempting to hide from the pursuing officers.

4.      Deputy Heck, the other K-9 officer and their dogs arrived at the scene with other officers, having earlier received a police radio broadcast that the two robbery suspects, armed with a gun, had fled into the nearby woods. The officers gave Aguila and his accomplice an opportunity to surrender by loudly announcing three (3) times that K-9 dogs were about to be used and that the suspects should come out of their hiding places in the woods and surrender. When neither Aguila nor his accomplice gave any indication that they were going to surrender, Heck and the other K-9 deputy, each with his dog, deployed to opposite ends of the thickly overgrown and wooded area

where the suspects were hiding.  The two K-9 officers used their dogs to begin

searching for the suspects.

5.      The other K-9 officer and his dog were the first to apprehend one of the

robbers, Aguila's accomplice.  When Heck saw and heard that the other suspect had

been apprehended, he proceeded with his own search, first by loudly announcing again

that he was using a police dog to track the robber.

6.      Heck's dog led Heck into the thick underbrush and woods, with Heck

trailing behind, constantly holding onto a 30-foot lead by which the dog was restrained.

The dog alerted to Aguila hiding in the bush and headed toward him, pulling Heck by

the end of the lead behind the dog through the heavy brush.  Hearing the approaching

dog, Aguila emerged from his hole.  The dog quickly grabbed Aguila with its mouth

and teeth on Aguila's arm near his wrist.  Aguila, a former boxer and martial arts

competitor, said he began "fighting the dog," and briefly succeeded in getting the dog

to loose his arm.  As it is trained to do, however, the dog then reattached to Aguila's

leg.

7.      At this point in their descriptions of the incident, the testimony of plaintiff

Aguila conflicts starkly with the testimony of defendant Heck as to what occurred when

Aguila was apprehended at the conclusion of his flight from the robbery scene and the

deputies' pursuit.  Aguila testified that Heck loosed the dog to attack him, even though

Aguila had attempted to submit to the arrest without resistance.  Aguila testified that

Heck, Canas, Renaudin and perhaps other officers, including an unidentified, tall black

deputy, spit on him and punched, kicked and beat him for ten minutes while he was

handcuffed, causing, in addition to the dog bites he had already received, lacerations,

bruises, a knot on his head and shoulder and other injuries.  Heck denied that he loosed

the dog on Aguila or that he or any other officer struck Aguila in any way at any time.

Canas and Renaudin testified that they were not at the scene of Aguila's arrest and that

they participated in his arrest only by investigating the matter and the related robberies

after Aguila was apprehended.  Heck testified that Aguila had apparently resisted the

dog when the dog caught up with plaintiff, and that Aguila's injuries probably occurred

in his scuffle with the dog in the heavy underbrush.

8.      Plaintiff's testimony that his injuries occurred because Heck loosed the

dog on him after he surrendered and that officers savagely beat him for ten minutes is

entirely lacking in credibility for several reasons.  First, Aguila is a convicted felon

whose conviction may properly be considered in assessing his credibility.  Fed. R.

Evid. 609.   Second, Aguila's version of events is wholly uncorroborated and

completely rebutted both by the physical evidence, including the photographs, police

reports and medical records, and by the overwhelming weight of credible testimony

presented by defendants, especially the wholly credible Deputy Heck.  None of the

several witnesses whose testimony plaintiff requested and introduced at trial saw any

officer or the police dog attack or strike Aguila.  Third, Aguila's minor injuries, as

shown in the photographs of him at the scene, Joint Exhibits 2-1 and 2-Z, 2-AA, 2-BB,

2-CC, 2-DD, 2-EE, 2-FF, 2-HH, 2-II, 2-JJ, 2-KK, 2-MM, 2-NN, 2-OO, and as

described in his medical records, were wholly inconsistent with his exaggerated and

false claim that he was beaten severely by police officers for ten minutes.  In addition,

various statements attributed to him in the police reports and his early requests for

treatment in his medical records blame the police dog, not any beating by officers, for

his injuries.  Not until almost five (5) months after his arrest in the September 1, 2010

psychiatric report ordered by the state trial judge as part of his criminal proceedings,

Joint Exhibit 1 (Record Doc. No. 24-3 at p. 9 of 22), does any claim of a beating by

police officers appear in the records.  Fourth, Aguila's demeanor, bearing and unduly

defensive and occasionally histrionic manner of testifying were wholly unpersuasive

and lacking in believability.

9.     The credible evidence establishes that Aguila's lacerations, bumps and

bruises occurred when he resisted and tried to fight with Heck's police dog, after the

dog caught up with Aguila and when Aguila refused to surrender in response to the

deputies' warnings.  Aguila's injuries, as described by him and his witnesses, depicted

in the medical records and observed by me at trial, are consistent with dog bites

suffered in a struggle that occurred in heavy underbrush and not with a purported ten-minute beating and kicking allegedly administered by numerous law enforcement officers.

10.    In summary, for the foregoing reasons, I find that Aguila is not credible in his description of defendants' alleged use of excessive force and failure to protect him from harm.

11.    Because plaintiff was injured, defendant John Carroll, a detective who investigated the robbery after Aguila was apprehended, instructed other deputies to take Aguila to the hospital for medical assistance and treatment, and they did so.  Defendant Kim Steirwald's only involvement was to take pictures of Aguila after his arrest. Aguila himself admitted in his testimony that neither Carroll nor Steirwald had anything to do with his alleged beating, with the police dog, or with any alleged failure to protect him from harm.  For these reasons, I orally granted defendants' motion to dismiss all claims against defendants Carroll and Steirwald at the close of plaintiff's evidence under Fed. R. Civ. P. 52(a)(1), and I reiterate that finding here.

12.    I specifically find that the testimony of all defense witnesses, especially Deputy Heck, was entirely credible in every way.  Heck's demeanor and manner of presentation and explanation, his obvious candor and sincerity regarding the safety of his dog, his fellow officers and plaintiff himself, his complete professionalism and the

sensible nature of his statements inspired total confidence in his testimony and made

him entirely believable.  Based on his credible testimony and the other believable

evidence, I reject Aguila's allegations and find that the use of the police dog was

entirely reasonable, no excessive force was used in his apprehension and no defendant

or any other deputy, whether or not named as a defendant, unconstitutionally failed to

protect him from harm.

## CONCLUSIONS OF LAW

1.      This is a claim pursuant to 42 U.S.C. § 1983.  Jurisdiction exists under 28

U.S.C. § 1331. Venue is proper in the Eastern District of Louisiana.

2.      Plaintiff's claims that any named defendant or any other unnamed sheriff's

deputy used excessive force or failed to protect him from harm in connection with his

arrest on April 12, 2010 is wholly without merit and must be dismissed with prejudice.

3.      The Fourth Amendment reasonableness standard applies to the use of

force during an arrest.  Sanchez v. Fraley, 376 F. App'x 449, 451 (5th Cir. 2010);

Harper v. Harris County, 21 F.3d 597, 600 (5th Cir. 1994).

4.      Assessing the reasonableness of a police officer's use of
force involves "a careful balancing of 'the nature and quality
of the intrusion on the individual's Fourth Amendment
interests' against the countervailing governmental interests
at stake."  This balancing "requires careful attention to the
facts and circumstances of each particular case, including
the severity of the crime at issue, whether the suspect poses
an immediate threat to the safety of the officers or others,

> and whether he is actively resisting arrest or attempting to evade arrest by flight." We judge the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct. We must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And we must account for the difficult and often split-second decisions that police officers must make in carrying out their duties.

Lytle v. Bexar County, 560 F.3d 404, 411 (5th Cir. 2009) (quoting Graham v. Connor,

490 U.S. 386,  396-97 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985))).

5.      To establish a claim of excessive force, a plaintiff must show that "he

suffered (1) an injury that (2) resulted directly and only from the use of force that was

excessive to the need and that (3) the force used was objectively unreasonable."

Peterson v. City of Fort Worth, 588 F.3d 838, 846 (5th Cir. 2009), cert. denied, 131 S.

Ct. 66 (2010) (quotation omitted).

> 6.      In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur. Thus, the extent of [the] injury inflicted may be considered in determining whether the officers used excessive force.

Deville v. Marcantel, 567 F.3d 156, 168 (5th Cir. 2009) (quotations omitted).

7.      As to Aguila's claim that defendants unconstitutionally failed to protect

him from harm, Aguila was a pretrial detainee at the time of the incident on which he

bases this claim.  In <u>Hare v. City of Corinth</u>, 74 F.3d 633, 650 (5th Cir. 1996), the Fifth

Circuit stated:

> (1) that the State owes the same duty under the Due Process Clause and
> the Eighth Amendment to provide both pretrial detainees and convicted
> inmates with basic human needs, including medical care and protection
> from harm . . . ; and (2) that a state . . . official's liability for episodic acts
> or omissions cannot attach unless the official had subjective knowledge
> of a substantial risk of serious harm to a pretrial detainee but responded
> with deliberate indifference to that risk.

8.      The Fifth Circuit has recognized that "'an officer who is present at the

scene [where excessive force is used] and does not take reasonable measures to protect

a suspect from another officer's use of excessive force may be liable under section

1983.'  A critical inquiry in a failure to intervene claim is whether the officer 'had a

reasonable opportunity to realize the excessive nature of the force and to intervene to

stop it.'"  <u>Taylor v. City of Shreveport</u>, No. 07-1817, 2009 WL 2762710, at *3 (W.D.

La. Aug. 27, 2009) (Hicks, J.) (quoting <u>Hale v. Townley</u>, 45 F.3d 914, 919 (5th Cir.

1995)); <u>accord</u> <u>Ryan v. City of Fort Worth</u>, No. 4:07-CV-310-A, 2009 WL 577284,

at *5 (N.D. Tex. Mar. 5, 2009) (McBryde, J.); <u>Dwyer v. City of Corinth</u>, No. 4:09-CV-

198, 2009 WL 3856989, at *5 (E.D. Tex. Nov. 17, 2009) (Schneider, J.).

9.      To establish a failure-to-protect claim, a pretrial detainee must show that

he was detained under conditions posing a substantial risk of serious harm and that

officials were deliberately indifferent to his need for protection.  <u>Pogue v. Bello</u>, 275

F.3d 1079, 2001 WL 1467095, at *1 (5th Cir. Oct. 25, 2001) (citing <u>Neals v. Norwood</u>, 59 F.3d 530, 533 (5th Cir. 1995)).  Here, while plaintiff alleges that he was exposed to harm by deputies' acts or omissions in failing to protect him either from an attack by a police dog or by other deputies, he fails to state a claim cognizable as a matter of law under Section 1983.

10.     Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Constitution.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976); <u>accord</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 182-83 (1976); <u>Hare</u>, 74 F.3d at 650.  "Deliberate indifference" means that a deputy is liable only if he knows that the detainee faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).

11.     Plaintiff must establish two requirements to demonstrate that the Constitution has been violated by failure to protect him from harm. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; . . . result[ing] in the denial of the minimal civilized measure of life's necessities."  <u>Id.</u> at 834 (quotation omitted).

12.     Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298).  An

officer cannot be held liable "unless the official knows of and disregards an excessive

risk to . . . health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." Id. at 834, 837; accord Newton v. Black, 133 F.3d 301, 308 (5th

Cir. 1998). "Mere negligence or a failure to act reasonably is not enough. The officer

must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d

621, 626 (5th Cir. 2003). If the court finds that one of the components of the test is not

met, it need not address the other component. Davis, 157 F.3d at 1005.

> 13. The Supreme Court has recently reaffirmed that "deliberate indifference"
> is a stringent standard of fault, requiring proof that a municipal actor
> disregarded a known or obvious consequence of his action. Board of the
> County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S.
> 397, 117 S. Ct. 1382, 1391 (1997) . . . . The "deliberate indifference"
> standard permits courts to separate omissions that "amount to an
> intentional choice" from those that are merely "unintentionally negligent
> oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citations

omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is

the appropriate test for deliberate indifference." Norton, 122 F.3d at 291 (citing

Farmer, 511 U.S. at 838-40).

14. In the instant case, based upon the findings of fact set out above, Aguila

fails completely to establish either that defendants used excessive force against him or

that they acted with deliberate indifference in any alleged unconstitutional failure to

protect him from harm.

15.     Defendants have asserted the defense of qualified immunity. C.A. No. 11-

653, Record Doc. Nos. 20, 34, 36 and 38 at p. 2 of each.  "Qualified immunity protects

government officials 'from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" Lytle, 560 F.3d at 409 (quoting Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982)).

> 16.     Assessing a defendant's entitlement to qualified immunity
> consists of two separate inquiries.  First, we ask whether the
> facts . . . show that the defendant's conduct violated a
> constitutional right.  We then ask whether the right violated
> was clearly established at the time. While it is "often
> appropriate" to answer these two questions sequentially,
> courts are vested with "sound discretion in deciding which
> of the two prongs of the qualified immunity analysis should
> be addressed first."

Sanchez, 376 F. App'x 449, 450-51 (quoting Pearson v. Callahan, 555 U.S. 223, 236

(2009); Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555

U.S. at 236).

> 17.     However, if the court
>
> determines that the alleged conduct did not violate a
> constitutional right, our inquiry ceases because there is no
> constitutional violation for which the government official
> would need qualified immunity.  If, however, the alleged
> conduct amounts to a constitutional violation, then we ask

> the "qualified immunity question" of whether the right was
> clearly established at the time of the conduct.

Lytle, 560 F.3d at 410 (quoting Saucier, 533 U.S. at 202) (citation omitted).  Because

I find that no constitutional violation occurred in Aguila's case, it is unnecessary to

address the qualified immunity defense.

18.     Specifically, applying the foregoing legal standards to the facts established

above, I find that the use of force against plaintiff, specifically use of the police dog by

Deputy Heck, was <u>not</u> excessive and was objectively reasonable under the

circumstances.  I further find no other named defendant or unnamed sheriff's deputy

used any force whatsoever against Aguila and that neither Deputy Heck nor any other

deputy otherwise failed to protect him from harm.

19.     Detective Heck's use of a police dog to capture and restrain Aguila was

wholly reasonable under the circumstances.  Aguila had fled the scene of a robbery

armed with what the victim had reported was a gun. Heck and the other deputies

commanded Aguila to surrender <u>before</u> using the dog.  The dog performed as trained,

and Heck did not loose the dog on Aguila or otherwise provoke any unjustified attack.

What Deputy Heck and his dog did to apprehend and subdue an armed, fleeing suspect

was reasonable under the circumstances.

20.     Plaintiff's resulting injuries, lacerations on his head, face and mouth, bruises, soreness, and subsequent numbness in his hand or wrist, were slight and caused entirely by his own efforts to escape and hide in heavy underbrush and his resistance to the police dog. His subsequent complaints of bruises, headaches, knots and inability to clench his fist, did not result directly and only from the use of force that was excessive to the need, but resulted from the application of force that was objectively reasonable in the circumstances.

21.     Aguila has failed to prove a violation of any constitutional right. All defendants acted in an objectively reasonable fashion in light of the circumstances and none acted with deliberate indifference to a known risk of serious harm. No reasonable police officer could have believed that the use of a police dog was not justified when Aguila, a suspect in a robbery armed with a gun who had fled on foot and was in hiding in a heavily overgrown and wooded area, disobeyed repeated commands to surrender and submit to arrest before the police dog would be used, and then actively resisted the dog in a physical struggle. See Ballard v. Hedwig Village Police Dep't, 408 F. App'x 844, 845 (5th Cir. 2011) (summary judgment granted in favor of police officers, dismissing failure to protect claim because dog-handling officer's actions were justified); Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1317 (10th Cir. 2009) (release of police dog when plaintiff had made threats, fled and was armed was not excessive

force); Johnson v. Scott, 576 F.3d 658, 660-61 (7th Cir. 2009) (arrestee bitten by police

dog failed to establish excessive force); Schneider v. Harris Cnty. Sheriff's Office, No.

H-07-2732, 2009 WL 347753, at *7 (S.D. Tex. Feb. 9, 2009), aff'd 373 F. App'x 504

(5th Cir. 2010) (no excessive force when officers responding to burglary call found

plaintiff hiding in shed, he refused to comply with officers' orders to come out and he

choked the police dog sent in after him, so that officers used force to subdue him).

22.     The actions of Deputy Heck and all other Jefferson Parish sheriff's

deputies in apprehending plaintiff were objectively reasonable.  I find that the credible

evidence establishes that Aguila was never subjected to unconstitutional excessive

force or a failure to protect him from harm.  Specifically, Heck did not release his

police dog to attack Aguila unjustifiably.  Aguila was not kicked, struck or beaten by

any deputies.  The only force employed in making the arrest was the use of the police

dog in a heavily overgrown and wooded area.  This force was reasonable in all respects

under the circumstances and was in no way excessive.  No officer unconstitutionally

stood by and failed to protect Aguila from harm.

23.     For all of the foregoing reasons, plaintiff's constitutional rights were in

no way violated when he was arrested.

* * * *

To whatever extent, if any, that any of the foregoing conclusions of law also constitute findings of fact, or vice versa, they are adopted as such.

Based on the findings of fact and conclusions of law set forth above, **IT IS ORDERED** that judgment be separately entered in favor of defendants, Johnny Heck, Frank Renaudin, John Carroll, David Canas, Kim Steirwald and Sheriff Newell Normand, and against plaintiff, Angel Miguel Aguila, dismissing plaintiff's claims with prejudice, all at plaintiff's cost.  Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this ___10th___ day of November, 2011.


_____
        JOSEPH C. WILKINSON, JR.
    UNITED STATES MAGISTRATE JUDGE